HARRIS, Chief Judge.
The primary issue on this appeal is whether Hughes Supply, Inc. “substantially complied” with the statutes and the various Florida Administrative Code provisions governing the maintenance, repair and closure of underground petroleum storage tanks. We find appellant’s other issues to be without merit.
The State of Florida Department of Environmental Regulation (“DER”), appellee, determined that appellant, Hughes Supply, Inc. (“Hughes”) was ineligible for coverage under Florida’s Petroleum Liability Insurance and Restoration Program (“PLIRP”) for a discharge incident that Hughes reported on August 30, 1991. Hughes petitioned for and received an administrative hearing. The hearing officer submitted his recommended order which contained the following findings of fact:[1]
Upon consideration of the oral and documentary evidence adduced at the hearing, the following relevant findings of fact are made:
1. Hughes is a Florida Corporation in good standing and authorized to do business in the State of Florida.
2. The Department’s facility no. 36-8519331 (the Facility), owned and operated by Hughes and the subject matter of this proceeding, is located at 2920 Ford Street, Ft. Myers, Lee County, Florida, and is a “Facility” as defined in Section 376.301(5), Florida Statutes.
3. The Facility consisted of (a) two underground storage tanks (USTs), one 4000 gallons UST (gasoline tank) and one 8000 gallons UST (diesel tank), and (b) four monitoring well[s], and is a “petroleum storage system” as defined in Section 276.301(15), Florida Statutes.
4. At all times material to this proceeding, Hughes held, and was the name insured of, an effective third party pollution liability insurance policy (No. FPL 7622685 — Renewal No. FPL 7621566) applicable to the Facility that was issued in accordance with, and qualified under, Section 376.3072, Florida Statutes. Hughes paid annual premiums exceeding $20,000.00 for the above insurance.
5. In accordance with Sections 376.-3072, Florida Statutes, and Chapter 17-769, Florida Administrative Code; the Department issued to Hughes a Notice of Eligibility pertaining to the Facility and the third party pollution liability insurance referred to in Finding of Fact 4 above.
6. Lee County, Florida has a local program approved by the Department pursuant to Section 376.3073, Florida *1058 Statutes, to provide for the administration of the Department’s responsibilities under certain sections of Chapter 376, Florida Statutes.
7. Diesel fuel was placed into the diesel tank at the Facility on August 12, 1991, and no diesel fuel has been placed in the diesel tank at the Facility since that date.
8. On Thursday, August 29, 1991, a contractor bidding on the removal of the tanks detected free product in one of the monitoring wells at the Facility and told Larry Carman, the Warehouse Manager for Hughes. Mr. Carman told Phillip Ross, the Branch Manager for Hughes, who in turn informed Gene Kendall, the Operations Coordinator for Hughes. All of this occurred on August 29, 1991.
9. On Friday, August 30, 1991, an employee of IT Corporation, acting upon the request of Gene Kendall, sampled the four monitoring wells at the Facility and found six inches of free product in the northwest monitoring well.
10. On Tuesday, September 3, 1991, Fred Kendall discussed the discharge with Bill W. Johnson, Supervisor, Lee County Storage Tank Local Program. During this discussion, Johnson learned that the diesel tank had not been emptied. Johnson advised Kendall that the diesel tank had to be emptied of its product and placed out of service.
11. On Tuesday, September 3, 1991 Mr. Kendall completed the Discharge Reporting Form (DRF) pertaining to the discharge and mailed the DRF to Johnson on September 4, 1991. The DRF indicated August 30, 1992, the day that IT Corporation confirmed the discharge, as the day of discovery of the discharge. The discharge was diesel fuel as indicated by the DRF and a “petroleum product” as defined in Section 376.3-1(14), Florida Statutes.
12. The discharge reported in the DRF constitutes a “discharge” as defined in Section 376.301(4), Florida Statutes, which constitutes an “incident” as defined in Section 376.3072(2)(c), Florida Statutes, and as described in Rule 17-769.600, Florida Administrative Code.
13. On Wednesday, September 4, 1991, Mr. Kendall also mailed a letter to Johnson stating Hughes’ intent to seek restoration coverage for the Facility, pursuant to Policy No. FPL 762285, Renewal No. FPL 7621566.
14. On September 13,1991 when Hooper, Inspector for the Lee County Storage Tank Local Program, inspected the Facility the diesel tank contained a total of 39⅝ inches of diesel and water, of which 4¾ inches was water.
15. On September 16, 1991 when Hooper again inspected the Facility, the diesel tank contained a total of 36¾⅛ inches of diesel and water, of which 4½ inches was water. On this date, Hooper advised Hughes that the diesel tank had to be emptied of its product. The inspection report issued on September 16, 1991 by Hooper advised Hughes that the Facility was not in compliance with Chapter 17-761, Florida Administrative Code.
16. On September 17, 1991, Hughes had the diesel tank emptied of all its product.
17. Although Hughes was in the process of emptying the diesel tank by giving diesel away, at no time between August 30, 1991 and September 16, 1991 was the diesel tank completely empty of its product.
18. Between August 30, 1991 and September 16, 1991 Hughes did not test the diesel tank to determine if the diesel tank was leaking and, if so, to pinpoint the source of the leak.
19. There was no evidence that either the Department or Lee County Storage Tank Local Program personnel ever informed Hughes before September 16, 1991 that there was a time frame within which the diesel tank had to be emptied of all of its product, and placed out of service in order for Hughes to be in compliance and eligible for reimbursement for restoration under the FPLIRP. Likewise, Hughes did not request any information from the Department or the Lee County Local Program personnel *1059 concerning any time frames within which the diesel tank had to be tested for leaks or emptied of its contents to prevent any further discharge in order to be eligible for reimbursement for restoration under the FPLIRP.
20. Between August 29, 1991 and September 17, 1991 Hughes bailed the monitoring wells at the Facility on a daily basis, removed the free product from the monitoring wells, and placed the free product in a sealed 55-gallon drum.
21. When the discharge was discovered, Hughes made the decision to close the Facility by tank removal, and at this point did not intend to repair or replace the Facility.
22. As a result of an inspection of the Facility by the Lee County Local Program personnel in May, 1991, Hughes was made aware that the Facility was not in compliance with Chapter 17-761, Florida Administrative Code, since the gasoline tank had not been used in over three years, and there had been no closure of the gasoline tank. This noncompliance with Chapter 17-761, Florida Administrative Code, concerning the gasoline tank was also a portion of the noncompliance report filed by Hooper on September 16, 1991. The gasoline tank comes within the definition of “unmaintained” as defined by rule 17-761.200(2), Florida Administrative Code.
23. Both the diesel tank and the gasoline tank were removed on October 28, 1991 by a Florida licensed storage tank system removal contractor, and the Facility permanently closed by IT Corporation on October 29, 1991.
24. In December, 1991, Hughes filed a tank closure assessment report pertaining to the removal of the diesel and gasoline tanks from, and closure of, the Facility. The tank closure assessment report was prepared by IT Corporation upon a request made by Hughes to IT Corporation on September 3, 1991 for a tank closure assessment proposal which was submitted by IT Corporation to Hughes on September 4, 1991.
25. In April or May, 1992, Hughes filed with Lee County a contamination assessment report prepared by IT Corporation pertaining to the removal of the USTs from and closure of the Facility.
26. Subsequent to discovery of the discharge, Hughes has expended approximately $60,000.00 as of June 10, 1992, on the Facility in connection with the USTs.
27. Site rehabilitation costs for the Facility have been estimated in a range of $220,000.00 to $245,000.00 as of June 10, 1992.
28. In the early part of 1991 water was present in the diesel tank, and approximately six months before discovering the discharge in August, 1991, Hughes had the water pumped out of the diesel tank. Hughes gave no explanation for the presence of water in the diesel tank. Neither the Department nor the Lee County Local Program personnel were notified of this unexplained presence of water in the diesel tank.
The hearing officer recommended that Hughes be denied restoration coverage for the reported discharge based on its failure to comply with statutory and code provisions governing underground storage tanks containing petroleum products. The Secretary of the Department entered her Final Order in which she accepted all of the hearing officer’s findings of fact. She modified his recommended order but found no error in the hearing officer’s determination that Hughes was not entitled to restoration coverage for the incident in question because of its noncompliance with the requirements of the applicable statute and rules.
Hughes timely appealed the Secretary’s final order. We affirm.
Hughes contends that the failure to comply with certain time deadlines contained in the Florida Administrative Code does not constitute lack of “substantial compliance” with the Code provisions as required by Section 376.3072 and therefore does not render Hughes ineligible for coverage under PLIRP. DER, on the other hand, maintains that the overriding legislative intent of section 376.3072 is to encourage prompt *1060 and immediate action to contain, remove, and abate discharge of pollutants. Therefore, time is of the essence in addressing a discharge, and Hughes’ delay in doing so violated, in a substantial manner, the Code provisions which contain express time deadlines for accomplishment of certain cleanup tasks.
The substantial compliance requirement is contained in Section 376.3072(3)(a):
(3)(a) ELIGIBILITY FOR PARTICIPATION. — Any owner or operator of a petroleum storage system, as defined in s. 376.301, who is subject to and in substantial compliance with this chapter and applicable rules relating to petroleum storage systems or petroleum contamination site cleanup adopted pursuant to s. 376.303 with respect to a particular location is eligible to participate in the Florida Petroleum Liability Insurance and Restoration Program for that location. (emphasis added)
This section requires that, in order to be eligible for PLIRP coverage, a facility owner/operator must substantially comply with all of the statutory and code provisions governing underground petroleum storage tanks. The section goes on to require the following:
In order to participate in the insurance and restoration program, an owner or operator must file an affidavit with the department, which affidavit states that the owner or operator has read and is familiar with this chapter and the rules relating to petroleum storage systems or petroleum contamination site cleanup ...
According to the above sections, not only must an owner/operator comply with the rules, he must know them himself and cannot rely on others to guide him through this maze of regulations.
The argument that substantial compliance requires an immediate response to evidence of a discharge is supported by several sections of Chapter 376:
376.305 Removal of prohibited discharges.—
(1) Any person discharging a pollutant ... shall immediately undertake to contain, remove, and abate the discharge ...
(2) If the person causing the discharge, or the person in charge of facilities at which the discharge has taken place, fails to act immediately, the department may arrange for the removal of the pollutant ... (emphasis added)
Section 376.3072(2), which describes the scope and type of coverage afforded under PLIRP, further emphasizes the need for immediate action:
In order for an eligible owner or operator to participate in the restoration program, the owner or operator must, upon discovery of evidence of a discharge of petroleum product at a facility, drain and remove from service the suspected petroleum storage system, if necessary, and complete initial remedial action as defined by department rules, (emphasis added)
In addition to the above-quoted provisions from the statutes governing petroleum storage tanks, the Florida Administrative Code is even more specific regarding time frames within which action must be taken:
17-769.600(13) The Department shall provide restoration coverage for the incident unless:
(a) The insured has failed to abate the known source of a discharge by taking the following steps:
1. The participating owner or operator shall, within 3 days of discovery of a discharge, test or empty the petroleum storage system or leaking component thereof. If the petroleum storage system or component is known to be leaking, the owner or operator shall within 3 days remove the system from service until it has been tested and either repaired or replaced, (emphasis added)
Based on the foregoing provisions, it is clear that taking immediate action in response to a discharge is a critical element of substantial compliance. The instant facts reveal that such immediate action was not taken in this case. The discharge *1061 was discovered on August 29, 1991 and was confirmed on August 30. Yet Hughes did not test or empty the system until September 17, a full seventeen days after discovery. This delay is even more inexcusable considering the fact that on September 3, the local representative of DER expressly advised Hughes that the tank had to be emptied. Although the representative did not say “immediately,” because the participants in the PLIRP program are required to read and be familiar with all statutory and code provisions governing USTs, Hughes is held to the knowledge that immediate testing or emptying was necessary.
Merely because Hughes was permitted into the program and paid the premiums does not entitle it to violate the statutory and rule conditions for continued coverage. Hughes asserts that the 1992 amendment to section 376.3072 is dispositive. Section 376.3072(2)(b)3 provides:
To be eligible, the facility shall be in compliance with the Department rules as demonstrated at the most recent inspection conducted by the Department or the insured demonstrates that any necessary corrective action identified at the most recent inspection have been corrected as ordered by the Department_(empha-sis added).
We reject the argument for two reasons. First, we agree with DER that the amendment is not retroactive. Second, even if applicable, Hughes failed to make the corrections “as ordered” by the Department in that immediate action was not taken. Not only must the identified corrective action be taken to comply with this provision, but the corrective action must be accomplished within the time period required by the Department through the statute and rules.
AFFIRM.
W. SHARP and PETERSON, JJ., concur.

. Findings contained in a recommended order of a hearing officer are entitled to great weight and may not be rejected or modified unless they are unsupported by the evidence. Kimball v. Hawkins, 364 So.2d 463 (Fla.1978). The issues on appeal do not challenge the above-quoted findings of fact.